688 A.2d 175

**Thomas P. SEMBER and Mary Ann Sember, his wife, Appellants,**

**v.**

**NATIONAL FEDERATION OF THE BLIND, a corporation; Genesis Computer Services; The Young Opportunities, Inc., a corporation; Ed Smith, an individual; Theodore Young, an individual; and National Federation of the Blind of Pennsylvania, Inc., a corporation.**

Superior Court of Pennsylvania.

Argued Oct. 2, 1996.

Filed Dec. 12, 1996.

Reargument Denied Feb. 24, 1997.

Charles W. Kenrick, Pittsburgh, for appellants.

Matthew R. Wimer, Pittsburgh, for Young, appellee.

Daniel Goldstein, Baltimore, MD, for Nat'l Fed., appellee.

Before KELLY, JOHNSON and OLSZEWSKI, JJ.

PER CURIAM:

Order Affirmed.

OLSZEWSKI, J., filed a dissenting opinion.

OLSZEWSKI, Judge, dissenting:

The majority holds that the publication at issue is incapable of having a defamatory meaning as a matter of law and that appellants are not sufficiently identified in the article as being the recipients of the accusatory statements. Because I disagree with both of these legal conclusions, I respectfully dissent.

Initially, my learned colleagues affirmed the order of the trial court that *The Braille Monitor* publication is legally incapable of a defamatory meaning. This is a central judgment in a defamation action, for this threshold must be fulfilled in order for the cause to proceed beyond its embryonic stage. *See, e.g., Livingston v. Murray,* 417 Pa.Super. 202, 207–09, 612 A.2d 443, 446 (1992). Therefore, where both innocuous and defamatory interpretations are reasonably plausible, the trial judge should give the non-moving party the benefit of the inference and allow the question to be resolved by a jury. *Id.*

After carefully reading the portions of the article alleged to be defamatory, I conclude that two specific statements are capable of a defamatory interpretation when read in concert with the article as a whole. The first passage reads as follows:

At a time when rehabilitation money is in short supply everywhere in the country for the purchase of technology that blind people need to become or remain competitive, why do so many state agency counselors insist on buying equipment from a company with a nationwide reputation for slow and unresponsive service and prices higher then those of the competition? Why is this done even when blind clients request alternative technology that they think will

serve their needs better? Some say that the answer lies in a combination of history, sloth, and inertia—the fact that TeleSensory (formerly TSI) has been in the field longer than most of its competitors and is bigger than the rest of them. *Others (whether correctly or not) cut through the niceties and call it collusion and skulduggery.*

Eight pages later, the author states that "[i]t is not appropriate *to funnel state business* to one producer, whose prices are high and whose service is slow to nonexistent."

The majority disposes of the former statement as non-actionable opinion. I believe that this wholesale dismissal is imprudent, however, for an opinion may well be defamatory if it may be understood to imply the existence of undisclosed facts. *See, e.g., Livingston,* 417 Pa.Super. at 211–13, 612 A.2d at 448. In the instant matter, I believe that this statement, which follows passages detailing the familial relationship between appellants and the allegedly poor quality of TeleSensory's products, could create the implication that the businesses are joined in a nefarious manner and the appellee has actual knowledge of the same.

Additionally, it is well established that statements tending to injure one in his or her business or profession are defamatory, providing that all other elements of the cause of action are present. *See, e.g., Livingston,* 417 Pa.Super. at 209–11, 612 A.2d at 447. Presently, I find that the statements at issue could be understood by a reasonable person to imply that appellants were engaged in unsavory and underhanded business practices. A plausible interpretation of these two statements, when considered in conjunction with the article as a whole, is that appellants have taken advantage of the fusion between their personal and business relationships to create a situation in which Mrs. Sember receives undeserved state contracts.

Moreover, these accusations could very well amount to criminal misconduct when one considers that a state agency and state monies are at issue. I believe that appellants were

entitled to the benefit of this inference, and that summary judgment should not have been granted in appellees' favor.

Our Supreme Court recently passed upon a similar issue in *MacElree v. Philadelphia Newspapers, Inc.*, 544 Pa. 117, 674 A.2d 1050 (1996). In that case, the judgment of this Court was reversed and the case remanded for trial after the Court concluded that a reasonable inference could be made that the challenged statement defamed the plaintiff. Factually, MacElree involved an article printed in the *Philadelphia Inquirer* which stated that then-District Attorney MacElree was "electioneering" and was akin to the "David Duke of Chester County" in resolving a dispute at the historically African–American Lincoln University.

This Court held that, because a bare charge of racism does not amount to actionable defamation, the trial judge was correct in awarding judgment to the defendant newspaper. However, the Supreme Court admonished that allegedly defamatory statements cannot be assessed in a vacuum and that, read and understood in context, the statements could very well amount to a charge of official misconduct and misuse of office.

I find the present case to be factually similar, and would thus hold that this Court should follow the recent precedent. While not explicitly charging appellants with criminal activity, the contested article certainly could create the implication that state funds are being improperly funnelled through dubious marital channels rather then proper business channels.

Additionally, in assessing the potential defamatory character of a statement, the nature of the audience must be considered. *See, e.g., Miketic v. Baron*, 450 Pa.Super. 91, 96–98, 675 A.2d 324, 327 (1996). Therefore, I find that these statements are especially damning in light of the fact that they were printed in a national publication for the blind. Had the statements appeared in a publication of general circulation, the percentage of sight-impaired readers would most certainly have been low as compared with the percentage of sight-impaired readers of the *Braille Monitor*. Indeed, such a publication is targeted to this special population, all of whom

must at some point desire the type of equipment sold by TeleSensory and its competitors. If these accusations prove to be unfounded and untrue, the Sembers' business reputations may nonetheless already be irreparably damaged and reflected in a diminishing clientele.

After reviewing these statements and others identified by appellants, the majority additionally concludes that "[n]owhere does the article accuse the Sembers of any untoward activities" and that the article was therefore "incapable of defamatory meaning **as to the Sembers.**" Majority opinion at 10–11. Rather, the majority concludes, the central thrust of the entire article concerns nothing more then TeleSensory's practice of exploiting familial relationships between its employees and state agency employees.

Although I believe that the issue of whether the statements are capable of a defamatory interpretation presents a close case, I have no trouble concluding that appellants are readily identified in the article. The entire article at issue, and the allegations contained therein, are premised upon the marital relationship between Mr. and Mrs. Sember, not upon a civil conspiracy, alter ego theory or a corporate identity of interest. In essence, the article grounds its accusations of wrongdoing upon the coexistent marital and business relationship.

Additionally, the Sembers are the only two employees of these Pittsburgh corporations that are identified by name. This is so even though the facts indicate that Mr. Sember has a practice of not personally referring business to his wife's corporation. Rather, Mr. Sember refers clients in need of special equipment to other BVS counselors, who are then free to recommend a supplier, one of whom is TeleSensory. If the author of the article intended to expose the malevolent business practices of the two entities, then specific identification of appellants would surely have been unnecessary.[1] As it stands,

---

**1.** A review of the deposition of Barbara Bowman, one of the authors of the publication in question, reveals a cognizance of the fact that appellants were being portrayed in an unflattering light. *See, e.g.,* RR Volume IV at 533.

a reader is left with the impression that the questionable business activities are directly linked to appellants' conduct.

I reach this conclusion cognizant of the fact that the present case presents a very close question of law. I do not intend to pass judgment upon the merits of the case and imply that appellants are entitled to prevail on their cause of action. Rather, my conclusion stems from the belief that two plausible interpretations can be gleaned from *The Braille Monitor* article, and that one of these interpretations is defamatory as to appellants. As such, I believe that summary judgment in this case was improvidently granted and would reverse the order of the trial court.

Q: Isn't it a reasonable interpretation of what's written in the first paragraph and elsewhere—again, about the Sembers and the Pittsburgh BVS, that's understood for these questions—that there's something unsavory going on?
A: Yes.